Filed 3/21/23 P. v. Hull CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBBIE HULL III,<br><br>Defendant and Appellant. | F083981<br><br>(Super. Ct. No. CRF67673)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County. Kevin M. Seibert, Judge.

Gabriel Bassan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Kari Mueller, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a jury trial on consolidated charges arising from two separate incidents, defendant Robbie Hull III was convicted of one count of assault with a deadly weapon, two counts of battery on a cohabitant, and one count of resisting arrest. Two of the

charges were misdemeanors from a 2018 domestic violence incident, which were added to more recent 2021 felony charges in a consolidated information filed before trial. Defendant contends (1) the trial court erred by denying his motion for judgment of acquittal on the deadly weapon charge; (2) the jury instruction for the deadly weapon charge erroneously permitted the jury to convict based on a legally inadequate theory; (3) his trial counsel provided ineffective assistance by failing to challenge the inclusion of the misdemeanor charges in the consolidated information without a preliminary hearing on those charges; and (4) regardless, remand for resentencing is required because the trial court imposed upper terms for the felony charges without proof of the aggravating circumstances in violation of recently amended Penal Code section 1170. (Undesignated statutory references are to the Penal Code.) We affirm in full.

## PROCEDURAL SUMMARY

This case arose from two separate incidents of domestic violence, originally prosecuted separately by the Tuolumne County District Attorney. First, a misdemeanor complaint charged defendant with battery upon a person in a dating relationship and resisting arrest, based on an incident on September 4, 2018. Second, a felony information filed October 13, 2021, charged defendant with three felonies arising from another domestic violence incident on September 24, 2021. The victim—defendant's girlfriend, Rachelle M.—was the same in both incidents, and the trial court granted the prosecution's motion to consolidate the two matters for trial purposes. Accordingly, on November 4, 2021, the prosecution filed a consolidated information for trial, charging defendant with the three 2021 felonies of battery causing injury to a cohabitant (§ 273.5, subd. (a); count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), and attempted criminal threat (§§ 664, 422; count 3), along with the two 2018 misdemeanors of battery upon a person in a dating relationship (§ 243, subd. (e)(1); count 4) and resisting arrest (§ 148, subd. (a)(1); count 5).

2.

After the close of evidence at the subsequent trial, defendant brought a section 1118.1 motion for judgment of acquittal on counts 2 and 3. The court granted the motion as to count 3 (attempted criminal threat) but denied it as to count 2 (assault with a deadly weapon). On December 14, 2021, the jury convicted defendant on all four remaining charges.

On January 14, 2022, the trial court sentenced defendant to an aggregate term of four years in prison as follows: on count 2, the upper term of four years; on count 1, the upper term of four years, stayed pursuant to section 654; and on each of the misdemeanor counts 4 and 5, one year concurrent to the felony terms. This appeal followed.

## FACTUAL SUMMARY

Both domestic violence incidents involved defendant and his girlfriend, Rachelle M., who had lived together since 2015 or so.

### *2018 Incident (Misdemeanor Counts 4 & 5)*

Because defendant does not challenge the sufficiency of the evidence as to counts 4 and 5, we provide only a cursory description of the incident. The first incident occurred on September 4, 2018, when 911 was summoned to defendant and Rachelle's residence because of a fight between them. According to the responding officers' testimony at trial, Rachelle told them that for some unknown reason defendant had struck her in the face multiple times with his hands and with a television remote control. In her trial testimony, however, Rachelle denied any physical violence or injuries from that incident. Defendant was arrested and charged with battery upon a person in a dating relationship and resisting arrest, which became counts 4 and 5 of the consolidated information.

### *2021 Incident (Felony Counts 1 & 2)*

The second incident occurred around 1:00 a.m. on September 24, 2021, when defendant and Rachelle were living together in an apartment. On that night, Rachelle called 911 and spoke to a dispatcher while standing outside the apartment. The recording

3.

of her 911 call was played for the jury, and the transcript was admitted into evidence. As reflected in the transcript, Rachelle told the dispatcher:

> "I don't know, I was in my bed watching a YouTube show and my boyfriend just got up and he has a fake—like a little bb gun and then, I don't know what he's mad about but he said for me to get off my phone and he's like I'm going to shoot you with my bb gun and then he hit me in the head with it and then I told him I was going to call the cops and he started [inaudible, crying]."

She reported defendant was also hitting her in the head and face with his hands and pushed her out the door. Rachelle repeatedly told the dispatcher she did not need medical attention but did say she could feel her lip swelling up, and she asked the dispatcher to stay on the phone until deputies arrived.

Rachelle then spoke with patrol deputy Shawn Betzenderfer, one of the responding officers. Betzenderfer found her next to the dumpsters in the parking lot of the apartment complex, where it looked like she was trying to hide herself from the view of an upstairs apartment. Betzenderfer testified Rachelle looked "frantic," "really worried," and he believed "something traumatic had happened to her." According to Betzenderfer, Rachelle told him she was lying down in her bed watching something on her phone when her boyfriend came in and told her to turn off her phone; she refused, and he then pointed a BB gun at her and told her he was going to shoot her. Rachelle told Betzenderfer she dismissed the threat, but then defendant "struck her with [the] BB gun on top of her head" and proceeded to strike her several times in the head and face with his hands, ultimately pushing her out of the apartment.

Rachelle showed Betzenderfer her swollen lip and said she was in pain. Betzenderfer saw the side of her face was red; and when he inspected the top of her head with a flashlight, he could see "some slight swelling and redness" and felt "a noticeable lump" where she described being struck. The prosecution introduced several photos of Rachelle's head and face, which were taken outside in the parking lot.

The prosecution also introduced a "Victim of Violent Crime Injury Report" that Rachelle completed in Betzenderfer's presence at the scene. The injury report, which was made part of the record in this appeal, shows Rachelle's handwriting and markings on an enlarged diagram of a head. Rachelle wrote that defendant hit her "about 7 times in the Head" and marked with an "X" the four locations where she was struck. Her notations reflect "pain" on the top of her head where she was "Hit with BB Gun" and "pain" on her upper left lip where she was "hit … with his hand." She also marked that she was hit by defendant's hand above her left eye and on her right cheek.

Betzenderfer further testified he offered to call a judge to request an emergency protective order, in keeping with typical practice in domestic violence cases. Rachelle accepted that offer, and he obtained an emergency protective order with an immediate move-out requirement. Rachelle, by contrast, testified Betzenderfer said he was going to obtain a protective order for her whether she wanted one or not.

At trial, Rachelle also gave a different account of the 2021 incident overall. Rachelle testified both she and defendant had been drinking and got into an argument where they ended up both pushing each other around the apartment. She wound up outside with no shoes on and called 911. According to Rachelle, the argument started when she was lying down in her room, playing on her phone, and suddenly all the lights in the apartment went off. She got up to see what was going on and discovered defendant had "turned off" all of the electrical circuit breakers. Defendant told her he did so because he thought she was "talking to a guy on Facebook." Rachelle testified defendant had a BB gun in his hand and was pointing it around, including at her, while screaming. Rachelle, who is five feet six inches tall, testified she was also screaming and pushing defendant—whom she estimated to be five feet ten inches or five feet eleven inches tall— to stop him from pointing the BB gun at her. Although she knew it was not a real gun, she still did not wish to be fired at.

When asked about defendant verbally threatening to shoot her with the BB gun and coming over and striking her on the head with it, Rachelle responded this was "a complete lie." She also testified she did not remember either telling Betzenderfer that defendant hit her in the face with open hands causing her lip to swell, or showing him the swelling on her head. Rather, she testified she was hit "[s]omewhere on [her] head" that night but she did not remember where, and she thought she was hit by his hand (not the BB gun).

Regarding the Victim of Violent Crime Injury Report, Rachelle testified she was drunk when completing it, and because she did not know where she was hit, Betzenderfer told her, "Mark all over your face." Betzenderfer, however, testified he noticed no signs of inebriation or alcohol consumption in Rachelle and he gave her no specific instructions as to what to write on the report. Rachelle further testified she did not remember "any actual injuries," and, if defendant hit her, there was no bleeding and no marks. Rachelle confirmed her intent to continue dating defendant and was concerned as to how the trial might affect him.

After defendant was detained, an officer recovered the BB gun from a kitchen drawer in the apartment. The officer brought the BB gun to court in a sealed evidence box and both were admitted into evidence.

## DISCUSSION

### I.    Sufficiency of the Evidence

Defendant first argues there was insufficient evidence to support his conviction on count 2 for assault with a deadly weapon.[1] Specifically, defendant argues a lack of

---

[1]Technically, defendant challenges the trial court's denial of his section 1118.1 motion for acquittal. However, in reviewing that ruling we apply the same deferential substantial evidence test employed in reviewing the sufficiency of the evidence to support a conviction. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We decline defendant's invitation, renewed at oral argument, to focus our review on the trial court's oral statement of its reasons for denying the section 1118.1 motion. Because our task is to review the judgment, not the trial court's

evidence that he used the BB gun in a manner likely to produce great bodily injury, given the limited extent of Rachelle's injury and the lack of testimony regarding how hard he struck her. We conclude there was sufficient evidence to support this conviction.

## A. Standard of Review

In reviewing a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) It is well settled that "'[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

## B. Relevant Law

Section 245, subdivision (a)(1) (section 245(a)(1)) punishes assaults committed "with a deadly weapon or instrument other than a firearm." For purposes of that section,

---

reasoning, we focus on the sufficiency of the evidence submitted to the jury rather than the propriety of the trial court's statements.

"a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.'" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029 (*Aguilar*).) Certain objects qualify as deadly weapons as a matter of law, also known as inherently deadly weapons (*id.* at p. 1029); but, undisputedly, BB guns are not among them. An object that is not inherently deadly may still qualify as a deadly weapon "as used" if the defendant "used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury." (*In re B.M.* (2018) 6 Cal.5th 528, 530 (*B.M.*); see *People v. Brown* (2012) 210 Cal.App.4th 1, 8 [finding substantial evidence from which jury could infer a BB gun fired at close range was a deadly weapon based on its manner of use].) "'Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate.'" (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464.) "[L]ikely" means "more than a mere possibility." (*B.M.*, at p. 534.)

In determining whether an object is used as a deadly weapon, the fact finder "may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar, supra*, 16 Cal.4th at p. 1029.) Importantly, the deadly-as-used standard "does not permit conjecture as to how the object could have been used." (*B.M., supra*, 6 Cal.5th at p. 534.) The determination "must rest on evidence of how the defendant actually 'used' the object." (*Ibid.*) "[S]peculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate." (*Id.* at p. 530.)

At the same time, it is entirely permissible for the fact finder to "consider what harm could have resulted from the way the object was actually used." (*B.M., supra*, 6 Cal.5th at p. 535.) The deadly-as-used analysis necessarily involves considering "potential harm" in light of the evidence (*ibid.*); what is proscribed is considering the object's potential *use*. (*Ibid.* ["the evidence may show that serious injury was likely, even if it did not come to pass"].)

8.

In assessing how the object was actually used, "the extent of any bodily injuries caused by the object" is relevant to section 245(a)(1)'s "fact-specific inquiry." (*B.M.*, *supra*, 6 Cal.5th at p. 530.) Neither injury nor even physical contact is required under section 245(a)(1), "but limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Id.* at p. 535.) The nature and extent of any injury, while "often controlling," is just one of the many circumstances the fact finder may consider in determining whether an object was used as a deadly weapon. (See *People v. Covino* (1980) 100 Cal.App.3d 660, 667 [the nature and extent of the injury, while "a relevant and often controlling factor," is also "not determinative"]; *People v. Muir* (1966) 244 Cal.App.2d 598, 604 ["the question of whether or not the force used was such as to have been likely to produce great bodily injury, is one of fact for the determination of the jury based on all the evidence, including but not limited to the injury inflicted"]; *People v. Schmidt* (1944) 66 Cal.App.2d 253, 256 ["The guilt of [the] appellant is not to be adjudged solely by the extent of the scratches and abrasions he left upon his victim"].)[2]

## C. Analysis

Initially, our review is limited to whether there is substantial evidence that defendant used *the BB gun* as a deadly weapon during the assault. It is settled that bare hands or feet cannot be deadly weapons. (*Aguilar*, *supra*, 16 Cal.4th at p. 1034 [a deadly weapon under § 245 "must be an object extrinsic to the human body"].) Thus, while

---

[2]From 1874 through 2011, former section 245(a)(1) proscribed both (A) assaults committed "with a deadly weapon or instrument other than a firearm" and (B) assaults committed "by any means of force likely to produce" great bodily injury. As of January 1, 2012, the latter type of "force likely" assaults were relocated to their own separate subdivision (a)(4). (Stats. 2011, ch. 183, § 1; see *People v. Aguayo* (2022) 13 Cal.5th 974, 986–988 [discussing legislative history].) Given our Supreme Court's recent confirmation that "assault with a deadly weapon (§ 245(a)(1)) and force likely assault (§ 245(a)(4)) are 'different statements of the same offense' (§ 954)" (*Aguayo*, at p. 996), and given that both versions "'look to the probability or capability of producing great bodily injury'" (*id.* at p. 985), however, this opinion draws on case law regarding either type of assault.

evidence of defendant striking Rachelle's face with his hands may be considered as part of the context of his use of the BB gun, defendant's hand-strikes themselves and their assertedly resulting injuries (redness of face and swollen lip) cannot form the basis for his deadly weapon conviction. (See *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1087 (*Beasley*).)

The only evidence of injury caused by the BB gun was Betzenderfer's testimony that he observed "some slight swelling and redness" and "a noticeable lump" on top of Rachelle's head where she described having been struck by the BB gun, and the corresponding photographs taken. Defendant argues the minor extent of Rachelle's injury is dispositive here because of the absence of any other evidence of the amount of force defendant used in striking her with the BB gun. We are not persuaded.

Defendant is correct there was no evidence describing how forcefully he wielded the BB gun when it contacted the top of Rachelle's head. The evidence of Rachelle's original description of the attack (her 911 call, the injury report, and Betzenderfer's testimony) conveyed only that defendant hit her "on top of her head" with the BB gun in some fashion. By the time she testified at trial, Rachelle would no longer acknowledge defendant ever struck her with the BB gun—much less describe how hard she was struck.

Defendant likens the limited evidence in this case to the testimony described as "far too cursory" to support a section 245(a)(1) conviction in *Beasley*, where one of the assaults was committed by the defendant beating his cohabitant with a broomstick about her shoulders and arms. (*Beasley*, *supra*, 105 Cal.App.4th at pp. 1087–1088.) The *Beasley* court held there was insufficient evidence of the broomstick's use as a deadly weapon because (1) the defendant did not strike the victim in the head or face, (2) the victim did not describe the degree of force used, and (3) there was no physical evidence or narrative description of the composition, weight, and rigidity of the broomstick, which was not introduced in evidence. (*Ibid.*) "The jury therefore had before it no facts from

which it could assess the severity of the impact between the stick and [the victim]'s body." (*Id.* at p. 1088.)

Although this case also suffers from a lack of description of the degree of force used, the similarities to *Beasley* end there. First, the BB gun was admitted into evidence, and the jurors were able to feel its weight and examine the object for themselves. The record does not include a description of the BB gun's weight and composition by which we, on appeal, might understand its nature; but that is all the more reason not to disturb the jury's implied finding of its dangerousness. (See *Aguilar*, *supra*, 16 Cal.4th at p. 1029 [noting the "nature of the object" as one factor in the deadly-as-used analysis].)

Second, unlike in *Beasley*, there was evidence defendant used the BB gun to hit Rachelle in the head—one of the most sensitive locations on the body. Blows to the head are often reasonably deemed likely to cause great bodily injury because of the potential for lasting damage to the brain or nervous system, from even a lightweight object. (See *People v. Hahn* (1956) 147 Cal.App.2d 308, 310–312 [in sustaining conviction for assault by force likely to cause great bodily injury based on the defendant hitting the victim with an empty beer can four times "'in the back of the head towards the top,'" noting life-long nervous disorders have been known to result from superficial head injuries].) Although Rachelle in fact suffered no serious injury, the jury could reasonably conclude there was "more than a mere possibility" that an identical strike by this BB gun might have left her in far worse condition. (*B.M.*, *supra*, 6 Cal.5th at p. 534.) Based on the sensitive location of the strike, we reject defendant's somewhat circular argument that "the amount of injury which [the BB gun] was likely to cause was the injury it did, in fact, cause," i.e., some minor swelling.

Beyond the dangerous location of the strike, the jury was also free to consider the circumstances surrounding the assault. Viewed most favorably to the verdict, the evidence showed defendant (while screaming) hit Rachelle in anger for simply not putting down her phone on command, after having just shut off the power in their

apartment late at night. Further, the attack was violent enough that Rachelle hid out of sight while calling 911, asked the dispatcher to stay on the line until officers came, and requested an emergency protective order. Such a chaotic and unprovoked attack— especially by someone much larger than she—could reasonably be viewed as likely to cause substantial harm. (See *Aguilar*, *supra*, 16 Cal.4th at p. 1029 [the fact finder "may consider the nature of the object, the manner in which it is used, *and all other facts relevant to the issue*" (italics added)]; *People v. Schmidt*, *supra*, 66 Cal.App.2d at pp. 255–256 [jury could determine force used was likely to produce great bodily injury based in part on "the malicious intention demonstrated by the unprovoked battery"].)

The jury was not required to give controlling weight to the limited nature of the actual injury, given the surrounding evidence of the location in which defendant struck Rachelle, what he struck her with, and the chaotic and violent circumstances of the attack. (See *B.M.*, *supra*, 6 Cal.5th at p. 535 ["the evidence may show that serious injury was likely, even if it did not come to pass"].) Substantial evidence supports a finding the BB gun was used in a manner both capable of producing and likely to produce great bodily injury.

## II. Instructional Error

Defendant next argues, however, that the jury may not necessarily have reached such a finding in this case, due to an instructional error on the deadly weapon charge.

### A. Standard of Review

We review de novo a claim of instructional error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*Ibid.*) "The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.)

12.

**B.    Analysis**

The trial court used a tailored version of CALCRIM No. 875 to instruct the jury regarding count 2, assault with a deadly weapon. The written instruction concluded with the following definition of the term "deadly weapon":

> "A *deadly weapon* is any object, instrument, or weapon <u>that is inherently deadly or one</u> that is used in such a way that it is capable of causing and likely to cause death or great bodily injury. In deciding whether an object is a deadly weapon, consider all the surrounding circumstances." (Underscoring added.)

Defendant argues, and the People concede, this definition erroneously included the underscored text referencing the "inherently deadly" theory of liability for a conviction under section 245(a)(1).

The above-underscored phrase is bracketed as an alternative provision in CALCRIM No. 875, the Bench Notes for which state the phrase should be given "only if the object is a deadly weapon as a matter of law." (Judicial Council of Cal., Crim. Jury Instns. (2022) Bench Notes to CALCRIM No. 875, p. 607.) As previously discussed, there are two methods of proving a violation of section 245(a)(1): proving an assault with a weapon that is deadly per se (inherently deadly), or proving an assault with a weapon that is deadly as used. (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028–1029.) It is undisputed courts have not held BB guns deadly per se. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 16 (*Aledamat*) ["what is meant by inherently deadly" is "an object that is *designed* for use as a deadly weapon"].) Thus, although the instruction correctly stated the law—embracing both theories of section 245(a)(1) liability—we agree with the parties that the reference to an "inherently deadly" weapon was error.[3] (See *Aledamat*, at

---

[3]Although trial counsel did not object to the wording of either the written or oral instruction for count 2, the claim is not forfeited because "we review the merits of any claim of instructional error that allegedly affects a defendant's substantial rights, even in the absence of an objection." (*People v. Brown*, *supra*, 210 Cal.App.4th at p. 9, fn. 5; see § 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [defendant did not forfeit argument that instruction was legally incorrect].)

p. 8 [error to give both "inherently deadly" and deadly-as-used theories in CALCRIM No. 875 unless the weapon used in the assault was inherently deadly as a matter of law].)

The parties further agree the inclusion of both alternative theories—without defining the term of art "inherently deadly"—was legal, as opposed to factual, error. (See *Aledamat*, *supra*, 8 Cal.5th at p. 8 [if the court had instructed the jury on the legal meaning of "inherently deadly," the error "would have been purely factual"; but as it was, the alternative-theory instruction amounted to legal error].)[4] Alternative-theory error—providing the jury with both a valid and an invalid theory for conviction—is subject to the same *Chapman* (*Chapman v. California* (1967) 386 U.S. 18, 24) prejudice standard applicable to other types of federal constitutional error. (*Aledamat*, at pp. 3, 9.) We "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.) We focus on the likelihood the jury applied the incorrect instruction, "not simply the strength of the evidence to support a guilty verdict using the correct instruction." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399.) It is enough if we can say, beyond a reasonable doubt, the legally inadequate

---

[4]A factually inadequate theory "'is an otherwise valid legal theory that is not supported by the facts or evidence in a case.'" (*Aledamat*, *supra*, 8 Cal.5th at p. 8.) A legally inadequate theory "is incorrect because it is contrary to law." (*Id.* at p. 7.) We presume jurors are able to evaluate and ignore factually incorrect theories and therefore apply a more lenient standard of review in that scenario. (*Id.* at p. 8; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [standard of review]; see *id.* at p. 1131 [jurors' "'own intelligence and expertise will save them from' the error of" receiving "'the option of relying upon a factually inadequate theory'" but not from receiving the option of relying on a legally inadequate theory].)

In *Aledamat*, the court deemed the alternative-theory error legal in nature both because the trial court failed to define the "inherently deadly" term of art *and* because the jury could reasonably—but mistakenly—classify a box cutter as inherently deadly based on a colloquial understanding of the term and the fact that box cutters are sharp and used for cutting. (*Aledamat*, *supra*, 8 Cal.5th at p. 15.) It is less clear to us whether BB guns are equally susceptible to such misclassification based on common understanding. If not, then the instruction could be viewed as simply presenting the jury with an obviously factually inapplicable theory. Neither party briefs this question, however, and therefore we assume without deciding that the error was legal.

theory did not contribute to the verdict. (See *Aledamat*, at pp. 12–13 ["Finding beyond a reasonable doubt that the error did not contribute to the verdict is essentially the same as finding the error harmless beyond a reasonable doubt"].)[5]

Assuming the error was legal in nature (see fn. 4, *ante*), we conclude it was nevertheless harmless beyond a reasonable doubt. The main reason for so holding is that both the prosecutor's and defense counsel's closing arguments made it abundantly clear to the jury the only applicable theory was that the BB gun was deadly based on how it was used. In evaluating the harmlessness of instructional errors, courts frequently look to counsel's arguments to the jury as a relevant circumstance—to see whether the attorneys focused their arguments on the incorrect theory of law. (See, e.g., *In re Martinez* (2017) 3 Cal.5th 1216, 1226–1227; *People v. Powell* (2021) 63 Cal.App.5th 689, 715–716.) In *Aledamat*, in holding harmless a similar alternative-theory error regarding an assault with a box cutter, our Supreme Court reasoned in part that neither counsel "ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 14.) This was despite the prosecutor actually stating the box cutter *was* inherently deadly "because 'you wouldn't want your children playing with' it, without further explaining the term." (*Ibid.*)

Here, by contrast, both the prosecutor and defense counsel explicitly argued a BB gun is not inherently deadly. The prosecutor identified the deadly weapon element as the crucial contested element of the section 245(a)(1) charge, stating:

> "So really this comes down to a deadly weapon. Was this BB gun being *used as* a deadly weapon?

---

[5]Defendant argues, under *People v. Guiton*, *supra*, 4 Cal.4th 1116 and *Griffin v. United States* (1991) 502 U.S. 46, the legal error in this case is of the type "generally requiring reversal." (*Guiton*, at p. 1128.) Without disputing that general proposition, our Supreme Court in *Aledamat* noted *Guiton*, which dealt with purely factual error, simultaneously recognized "that this does not mean that reversal is always required when the error is legal." (*Aledamat*, *supra*, 8 Cal.5th at p. 8, citing *Guiton*, at p. 1129.) *Aledamat*, not *Guiton*, establishes the harmlessness standard of review applicable to alternative-theory error, and we apply that standard here.

"Now, inherently, a BB gun by itself is not a deadly weapon. It's not a real gun, right? Just having a BB gun does not mean that it's inherently deadly or could cause great bodily injury." (Italics added.)

For his part, defense counsel projected CALCRIM No. 875 on a screen for the jurors and walked them through its deadly weapon definition:

"So you can have a deadly weapon with inherently dangerous weapons, and examples of that are guns, hand grenades, things that are inherently dangerous.

"*A BB gun is not inherently dangerous.* It's not going to cause great bodily injury or death unless it's *used in a manner* that would cause great bodily injury or death." (Italics added.)

In keeping with these express opening disclaimers, both attorneys then argued the deadly weapon element by exclusive reference to evidence of how the BB gun was used.

For example, the prosecutor argued:

"Any time you take an object in your hand, I submit to you a pot or pan, a 2x4, a brick, something solid, and swing at somebody's head, that object now becomes a deadly weapon because you are using it in a way that is likely to cause or can cause great bodily injury. Striking someone in the head with a weighted object, this now, a BB gun, becomes a deadly weapon."

Defense counsel countered:

"Now, the People have argued that swinging a gun around, a weighted gun—or a BB gun is something that would cause or is likely to cause great bodily injury or death.

"And that's not what the evidence suggests. He wasn't swinging it around. The testimony was that he hit her on top of the head, didn't cause any injuries. And if you look, in deciding whether an object is a deadly weapon, consider all the circumstances. Lack of injury is a good indication that this particular item was not used as a deadly weapon."

Far from suggesting the jury should treat the BB gun as an inherently deadly weapon, these arguments counseled against any such finding and repeatedly focused the jury's attention on the question of whether the BB gun was used in a deadly manner.

16.

Defendant contends for the first time in his reply brief that because defense counsel argued the BB gun was not inherently dangerous without advising the jury this was because BB guns do not qualify as such as a matter of law, his argument indicated to the jury that both theories "were legally in play." This stretches the harmlessness inquiry too far and ignores the overall import of defense counsel's argument. The excerpts above made clear to the jury no one was arguing the BB gun was inherently deadly and a conviction would have to be based instead on how the BB gun was used. When attorney arguments are held to lessen the impact of erroneous instructions, it is not necessarily because counsel verbally corrected the legal error contained in the instruction; it is enough that they did not, themselves, affirmatively press the incorrect theory. (See *People v. Powell*, *supra*, 63 Cal.App.5th at p. 716 & fns. 30, 31 [noting "the prosecutor never argued" the legally inapplicable theory and comparing other cases that turned on which theories the prosecutor argued to the jury].) The attorney argument here surpassed the minimum set by the Supreme Court in *Aledamat* by informing the jury there was only one way it could decide whether the BB gun was a deadly weapon—the legally permissible way. (Cf. *Aledamat*, *supra*, 8 Cal.5th at p. 14 [noting neither counsel "ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon"].)

Further supporting our harmlessness holding, the same paragraph erroneously defining a "deadly weapon" also instructed the jury (in the very next sentence) to "consider all the surrounding circumstances" "[i]n deciding whether an object is a deadly weapon." As shown in the excerpt above, defense counsel specifically called the jury's attention to this sentence in the CALCRIM No. 875 instruction projected for them. This instruction to consider all surrounding circumstances was also given, albeit in more detail, in *Aledamat* as part of the CALCRIM No. 3145 instruction for a section 12022 personal use enhancement not charged here. (See *Aledamat*, *supra*, 8 Cal.5th at p. 14 ["'In deciding whether an object is a deadly weapon, consider all of the surrounding

17.

circumstances including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose'"].) The Supreme Court reasoned, "This part of the instruction suggested the question was unitary, that is, that the jury had to consider all of the circumstances in deciding whether the object was a deadly weapon, *either* inherently *or* as used." (*Ibid.*) Bound by this precedent, we similarly conclude the jury here would also "likely view the 'inherently deadly' language in light of this additional instruction that it had to consider all of the circumstances." (*Ibid.*) It would therefore be "unlikely [to] … simply view the [BB gun] as inherently deadly without considering the circumstances, including how defendant used it." (*Ibid.*)

*Aledamat* also refutes defendant's remaining argument that the jury still might have convicted him under the inherently deadly theory because of the trial court's separate directive: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The jury would not likely see any conflict between the court's instruction on the deadly weapon definition and the attorneys' arguments because, in context with the reference to all surrounding circumstances, the definition's technically disjunctive "or" takes on a more "unitary" character. (See *Aledamat*, *supra*, 8 Cal.5th at pp. 13–14 [rejecting the presupposition that the jury would believe there were two separate ways to find an object to be a deadly weapon, based on an identically phrased instructional definition].)

Finally, in contrast to knives or other sharp objects used for cutting, BB guns are not amenable to classification as "inherently deadly" based on a lay understanding of those words. No reasonable juror would have understood a BB gun—a toy for recreation, with no self-imbued deadly qualities—to be inherently deadly by nature.

Although there was not "overwhelming" evidence of defendant's guilt on a deadly-as-used theory, the focus of the prejudice inquiry is on the likelihood the jurors applied the erroneous "inherently deadly" portion of the instruction, as shown by

18.

*Aledamat*'s analysis. (See *People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 399 ["Th[e] focus on the impact of the erroneous instruction rather than the strength of the evidence of guilt is central to *Aledamat*'s reasoning on prejudice"], citing *Aledamat*, *supra*, 8 Cal.5th at pp. 13–15.) There was sufficient evidence to convict on the proper theory, and for the above reasons we conclude it was highly unlikely any juror found defendant guilty because they believed the BB gun to be an inherently deadly weapon.

Given the clarity and uniformity of the attorneys' arguments, the accompanying language of the instruction, the nature of the item in question, and the sufficiency of the evidence on the proper theory, the instructional error was harmless beyond a reasonable doubt. The conviction on count 2 is therefore affirmed.

## III. Ineffective Assistance of Counsel

Next, we turn to the misdemeanor convictions on counts 4 and 5. Defendant argues these convictions must be reversed because trial counsel provided ineffective assistance by failing to challenge their consolidation into a felony case without a preliminary hearing. While we agree the consolidation was procedurally improper, on this record we cannot conclude counsel was ineffective for failing to raise this challenge in the trial court.

### A. Standard of Review

To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel (2) with resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–692 (*Strickland*); *People v. Caro* (2019) 7 Cal.5th 463, 488.) "On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'"" (*Caro*, at p. 488.) As to deficient performance, an ineffective assistance claim "based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission [citation], but also that the

19.

motion or objection would have been meritorious …." (*People v. Mattson* (1990) 50 Cal.3d 826, 876.) As for prejudice, a defendant must show a "reasonable probability" that, but for counsel's deficiency, "the result of the proceeding would have been different." (*Strickland*, at p. 694 [defining reasonable probability as "a probability sufficient to undermine confidence in the outcome"].)

## B. Additional Background

As described above, counts 4 and 5 of the consolidated information are misdemeanor offenses—battery upon a person in a dating relationship (§ 243, subd. (e)(1)) and resisting arrest (§ 148, subd. (a)(1))—that were originally charged in a misdemeanor complaint filed some two or three years before the 2021 incident occurred. The record reveals little of the procedural history of the misdemeanor complaint, aside from some discussion of defendant failing to appear in August 2019 for a jury trial on the misdemeanor charges and absconding until his subsequent arrest in 2021.

Counts 1 and 2, the felony counts from the 2021 incident, were originally charged in a felony complaint filed September 27, 2021. A preliminary examination was held on October 8, 2021, on that felony complaint, with the court finding probable cause for both counts. No evidence was heard regarding the 2018 incident at the preliminary examination. The only discussion of the misdemeanors case was to note it was trailing the felonies case.

On October 13, 2021, the district attorney filed a felony information charging the same counts 1 and 2 and adding the later-dismissed count 3 (attempted criminal threat). On October 25, 2021, the district attorney moved to consolidate the misdemeanors case and the felonies case for trial purposes, citing the common victim in both incidents. At the November 4, 2021, hearing on the motion, defendant's counsel (the deputy public defender) opposed consolidation on the grounds that allowing the misdemeanors to be heard with the felonies would prejudice defendant, given the propensity effect. Noting

the cross-admissibility of the 2018 incident under Evidence Code section 1109, the court granted the motion to consolidate.

### C.    Analysis

The People argue defendant fails to show both deficiency and prejudice.  As to deficient performance, the People do not dispute there was a valid ground on which to challenge the joinder of the misdemeanors as counts 4 and 5 of the consolidated information, given their lack of presentation at a preliminary hearing.  For over a century, it has been the law in this state that a defendant cannot be prosecuted for an offense charged in an information but not shown by the evidence at a preliminary hearing.  (See *Griffith v. Superior Court* (2011) 196 Cal.App.4th 943, 953–954 ["no crime, be it a felony or a misdemeanor, can be included in an information unless it has been supported by a showing of probable cause at the preliminary hearing.  (§§ 737–740, 871–872.)"]; *People v. Burnett* (1999) 71 Cal.App.4th 151, 166–167 [§ 1009's prohibition against "'amending an information to charge an offense not shown by the evidence taken at the preliminary hearing'" "'has remained virtually unchanged for over 80 years'"].)  This rule applies equally in a felony case, like this one, where "a misdemeanor or infraction is charged in conjunction with a felony" (§ 691, subd. (f); see *Griffith*, at p. 951 [noting the "well-established requirement that misdemeanors included in an information must be supported by a showing of probable cause at the preliminary hearing"].)

Instead, the People argue trial counsel may have decided not to challenge the inclusion of the misdemeanor counts because to do so would have been "futile, pointless," since the charges could have been refiled and a comprehensive preliminary examination held.  To be clear, an objection or motion to set aside counts 4 and 5 of the consolidated information would not have been "futile" in the legal sense of the word. It is immaterial for purposes of *Strickland* deficiency whether the People might have had another viable route to successfully convicting defendant on the charges unlawfully added to the consolidated information.  The question is whether "the motion or objection

21.

would have been meritorious." (*People v. Mattson*, *supra*, 50 Cal.3d at p. 876.) On this record, a challenge to the misdemeanor charges as unproved by preliminary examination would have been successful (assuming, as we must, that the trial court would have correctly applied the law).

Nevertheless, the perceived futility of such a challenge—in a more colloquial sense—provides a potential "satisfactory explanation" for trial counsel's inaction. (See *Caro*, *supra*, 7 Cal.5th at p. 488 [we must reject ineffective assistance claims on direct appeal ""unless there simply could be no satisfactory explanation"" for counsel's challenged action or omission].) For example, trial counsel may have recognized the risk that a successful motion to set aside could prompt the prosecutor to bring a new complaint alleging all charges, hold another preliminary hearing with evidence regarding both incidents, and refile a new information—leaving defendant in the same position except for a delay of trial, which defendant may not have wanted. (See *People v. Uhlemann* (1973) 9 Cal.3d 662, 666 [recognizing authority to reprosecute same offense after an order setting aside an information]; see also § 1387 [two-dismissal rule].)

On this limited record on direct appeal, we cannot say it would be irrational for trial counsel to have decided that the potential benefit of eliminating the misdemeanor counts was outweighed by the potential delay in resolving the felony charges. (See *People v. Robinson* (2004) 122 Cal.App.4th 275, 282–283.)

We acknowledge, as defendant points out, the prosecution would also face certain risks and difficulties if it chose to refile and request a new preliminary examination— including ensuring the victim's continued cooperation at any rescheduled trial, despite her ongoing relationship with defendant. This might have factored into trial counsel's risk-benefit assessment, as might the fact that the preliminary examination on the felony charges had only just occurred within the last month, potentially leading him to believe refiling was particularly likely because "starting over" would not entail much duplicated effort. We will not speculate further as to what considerations trial counsel may or may

not have been weighing. The point is that at least one satisfactory explanation may exist—namely avoiding a delay of trial without any assurance of an ultimate reduction in charges. "There are myriad reasons why counsel may choose a particular course of conduct, and attorneys should be afforded the opportunity to explain if a decision was tactical when a client alleges their assistance fell below professional standards." (*People v. Zaheer* (2020) 54 Cal.App.5th 326, 336.)

Defendant argues trial counsel's assertion of a prejudice-based objection to the unlawful consolidation refutes the possibility that counsel had a strategic reason for not objecting based on the lack of preliminary presentation. We recognize the general rule, as stated in defendant's cited cases regarding evidentiary and instructional objections, that an attorney's actual assertion of a nonmeritorious objection "refutes any inference" he or she declined to assert a different (meritorious) objection for some strategic reason. (*People v. Asbury* (1985) 173 Cal.App.3d 362, 365–366; see *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1130–1131.) However, that rule applies best when the actual objection and the unmade preferred objection could be seen as likely to yield similar results. Here, the desired result of trial counsel's actually asserted opposition to consolidation (that joining the cases would cause propensity prejudice) was to maintain the separate prosecution of the felony matter, apart from the misdemeanors case. Asserting that prejudice objection did not create a risk of delaying adjudication of the felonies, as would the hypothetical assertion of an objection based on lack of preliminary presentation. Therefore, trial counsel's actual objection does not eliminate the possibility counsel withheld a preliminary presentation-based challenge for strategic reasons.

Lacking affirmative record evidence precluding the possibility of a rational tactical purpose for the challenged omission, we decline to resolve defendant's ineffective assistance claim in this direct appeal.[6] (See *People v. Lopez* (2008) 42 Cal.4th 960, 972

---

[6]Notably, in *Burnett*, which resolved an ineffective assistance claim in the appellant's favor, the court had before it a declaration from trial counsel, filed with the appellant's separate

23.

["except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal"].) Because we are unable to hold trial counsel's performance deficient, we need not address the parties' prejudice arguments. (See *Strickland*, *supra*, 466 U.S. at p. 697.)

## IV.     Section 1170 Sentencing Error

Finally, defendant argues we should remand this case for resentencing because the trial court erred by imposing upper terms for counts 1 and 2 without the proof of aggravating circumstances newly required by section 1170, as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567).

Senate Bill 567's amendments to section 1170, subdivision (b) (section 1170(b)) went into effect on January 1, 2022, two weeks before defendant's sentencing. (Stats. 2021, ch. 731, § 1.3.) As amended, section 1170(b)(2) now provides (as it did at the time of sentencing): "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170(b)(2).) As an exception, however, subdivision (b)(3) permits the court to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170(b)(3).)

### A.     Additional Background

At the sentencing hearing on January 14, 2022, defense counsel urged the court to impose the middle term for counts 1 and 2—rather than the upper term of four years

---

habeas corpus petition after oral argument, in which counsel stated he had no tactical reason for failing to object to amendment of the information. (See *People v. Burnett*, *supra*, 71 Cal.App.4th at pp. 157, 181.)

24.

recommended by the probation officer—based on Senate Bill 567's newly effective amendments. The prosecutor noted the case was in "an awkward stage," with the trial having been conducted before the new proof requirements went into effect; however, she noted the court could consider certified records of defendant's prior convictions. At trial the People had introduced a certified record of one prior conviction: a March 2012 felony conviction under section 273.5, subdivision (a) (battery causing injury to a cohabitant). At the sentencing hearing, the prosecutor stated she "also [had] other priors in [her] system that are certified [that she] could show." However, the court did not respond to that offer, and no other certified records of conviction appear in the record.

Instead, argument turned to whether the court could also consider the misdemeanor convictions on counts 4 and 5 obtained in the instant case (arising from the 2018 incident) for purposes of determining the appropriate sentence for counts 1 and 2 (arising from the 2021 incident). The prosecutor argued the present conviction on count 4 and the certified prior conviction from 2012 supported imposing the upper term. As her "final word," the prosecutor asked the court "to find aggravated [*sic*] based on prior conduct that was proven at the trial." In response, the court declared, "I am going to find it aggravated based on both the criminal finding at the trial and on [defendant's] criminal history." Therefore, the court imposed the upper term of four years in prison on both count 1 and count 2, making count 2 the primary and staying the sentence on count 1 pursuant to section 654.

At sentencing, the court had before it a probation report that listed—as relevant to this analysis—some 10 prior convictions for defendant, dating from 2013 to 1998. At least five of the listed convictions were offenses related to domestic violence: one 1998 misdemeanor conviction under section 273.5, the 2012 felony conviction under section 273.5 for which the certified record was received, and three misdemeanor convictions for violating a domestic relations protective order in 2013. The report stated the listed

information was obtained "from a CLETS [California Law Enforcement Telecommunications System] printout dated January 10, 2022."

### B. Analysis

The People concede the trial court's unqualified reliance on defendant's "criminal history" violated section 1170(b) by considering defendant's "entire criminal history" as an aggravating circumstance, without receiving certified records of conviction for most of the prior offenses summarized in the probation report. However, they argue this was a harmless error of state law. We agree that, to the extent the trial court based the upper term on defendant's entire criminal history, it erred; but we also agree this error was harmless.

#### 1. Error

Section 1170(b) prohibits the imposition of an upper-term sentence without both (i) "circumstances in aggravation" that justify a heavier sentence, and (ii) "facts underlying those circumstances" that have been (1) stipulated to by the defendant, (2) found true beyond a reasonable doubt by the jury, or, if the fact is a fact of prior conviction, (3) demonstrated by a certified record of conviction. (See § 1170(b)(2)–(3).)

The trial court tersely stated it was imposing an upper term "based on both the criminal finding at the trial and on [defendant's] criminal history." From the preceding discussion with counsel, it is clear the "criminal finding at the trial" referred to defendant's 2018 conduct proved by the trial evidence supporting the guilty verdicts on counts 4 and 5. The parties therefore identify the relied upon circumstances in aggravation as (A) defendant's 2018 criminal conduct, and (B) his "criminal history." With some hesitation, we adopt this framing.[7]

---

[7]More typically, aggravating circumstances are of the sort enumerated in California Rules of Court, rule 4.421, which provides a nonexclusive list of factors constituting "[c]ircumstances in aggravation," such as "[t]he defendant's prior convictions as an adult … are numerous or of increasing seriousness," or "[t]he defendant's prior performance on probation … was unsatisfactory." (*Id.,* rule 4.421(b)(2), (5).) However, the People do not oppose defendant's

As to the first circumstance, defendant's 2018 criminal conduct, there was no error because the underlying facts giving rise to the two 2018 misdemeanor offenses were found true beyond a reasonable doubt by virtue of the jury's guilty verdicts in the instant trial. (See § 1170(b)(2).) However, not all the facts underlying the second circumstance, broadly phrased as defendant's "criminal history," were proved to the degree required by section 1170(b). Primarily, defendant's commission of the other nine prior convictions listed in the probation report—all but the 2012 domestic violence conviction—lacked any stipulations or jury findings, and the probation report itself is not a certified record of conviction. (See *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1114; *People v. Dunn* (2022) 81 Cal.App.5th 394, 403 (*Dunn*), review granted Oct. 12, 2022, S275655.)

Therefore, the court's sentencing decision violated section 1170(b) and we must remand for resentencing unless the error was harmless.

### 2.    *Prejudice*

The prejudice standard for errors under section 1170(b), as amended, is currently in flux, with several courts of appeal establishing differing frameworks while our Supreme Court considers the question. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.) The People recite the framework announced by this court in *Dunn*, *supra*, 81 Cal.App.5th 394, review granted, while defendant relies on the framework set forth by Division One of the Fourth District Court of Appeal in *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*). In keeping with this court's prior decisions, we believe *Dunn* provides the proper framework.

*Dunn*'s step (1)(a)—which checks for prejudice with respect to the Sixth Amendment under the *Chapman* standard—is satisfied if "beyond a reasonable doubt … the jury would have found one aggravating circumstance true beyond a reasonable doubt." (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410, review granted.) Another way to

framing of the circumstances in aggravation considered by the trial court, which itself referenced none of the enumerated rule 4.421 factors.

27.

satisfy step (1)(a) is if there was no error in the trial court's reliance upon at least one aggravating circumstance, in which case we proceed to step (1)(b) to check for prejudice under section 1170(b) based on the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818) standard of review. (See *Dunn*, *supra*, at p. 410 & fn. 14 [reasoning the lack of error in relying upon the first and third aggravating circumstances shows the Sixth Amend. requirements were met and therefore "we need not determine beyond a reasonable doubt whether the jury would have found any one aggravating circumstance true beyond a reasonable doubt"].)

*Dunn*'s step (1)(b) requires us to find "no reasonable probability the jury would not have found the remaining aggravating circumstance(s) true beyond a reasonable doubt." (*Dunn*, *supra*, 81 Cal.App.5th at p. 401; see *id.* at pp. 409–410, review granted.) If both steps (1)(a) and (1)(b) are met, then any error was harmless, and the prejudice analysis ends.

If any aggravating circumstance is deemed not provable to the above standards, then step (2) asks "whether the trial court would nevertheless have imposed the upper term based on the remaining [proved or adequately provable] aggravating circumstances." (*Dunn*, *supra*, 81 Cal.App.5th at p. 408; see *id.* at p. 410, review granted.) This second step is the same one espoused in *Lopez*. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.)

Defendant focuses his argument on this second step, arguing the dispositive question is whether the court would have imposed the upper term based on the 2018 conduct alone. Defendant argues the colloquy at sentencing demonstrates the court would not. The problem is that defendant entirely skips the initial steps of the prejudice analysis.[8] He therefore overlooks the possibility that, as we conclude, a fact finder would

---

[8]*Dunn*'s step (1)(a) is essential to ensure no Sixth Amendment violation would result. (*Dunn*, *supra*, 81 Cal.App.5th at p. 401, fn. 5 ["In order to reach the second step, the reviewing court must conclude beyond a reasonable doubt that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt. Otherwise, the sentence violates the

almost certainly have also found true the unproved convictions within defendant's criminal history (step (1)(b))—thereby eliminating the need to analyze whether the court would have exercised its discretion differently if it had relied on the 2018 criminal conduct alone (step (2)).

Here, as in *Dunn*, step (1)(a) is satisfied because—as explained above—there was no error in the court's consideration of the first aggravating circumstance, defendant's 2018 criminal conduct. (See *Dunn*, *supra*, 81 Cal.App.5th at p. 410, review granted.) Indeed, the jury in fact found that aggravating circumstance true beyond a reasonable doubt.

As to step (1)(b), we conclude there is no reasonable probability the fact finder[9] would not have found true beyond a reasonable doubt that defendant committed the uncertified prior convictions listed in the probation report. Since the court almost certainly considered all of defendant's listed prior convictions—not just the certified 2012 domestic violence conviction—in relying on defendant's "criminal history," this analysis boils down to a question of whether or not defendant was actually convicted of the listed crimes and whether certified records of those convictions exist.

There is more than a reasonable probability defendant was convicted of the crimes listed in the probation report. The report gave the CLETS database, established and maintained by the state Department of Justice, as the source of the convictions listed. (See *People v. Martinez* (2000) 22 Cal.4th 106, 124–125 [discussing CLETS and Evid.

_____

Sixth Amendment"], review granted.) And, where the inquiry proceeds past the first steps, *Dunn*'s step (1)(b) is essential to proper analysis of step (2), which depends on which aggravating circumstances are deemed "provable from the record *as determined in the prior steps*." (*Id.* at p. 410, italics added.)

[9]We do not assume the fact finder would be "the jury" as stated in *Dunn* because of section 1170(b)(3)'s exception and the well-established Sixth Amendment exception for increasing sentences based on "the fact of a prior conviction." (See *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 ["*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" (italics added)]; *People v. Black* (2007) 41 Cal.4th 799, 818.)

Code, § 664's presumption of regular performance of official duties].) Defendant does not suggest any noncompliance with the section 1203d requirement that the defendant or his or her attorney receive an advance copy of probation reports. Had the official records summarized in the report inaccurately listed his prior convictions, there would have been no logical reason for defendant not to dispute them in an effort to mitigate his sentence. The lack of any objection to the information listed in the probation report gives us confidence the prior convictions occurred. Although a probation report cannot be considered a certified record of conviction for purposes of identifying section 1170(b) error, we see no reason to ignore a probation report's contents for purposes of assessing harmlessness.

There is also more than a reasonable probability that sufficient certified records of conviction exist for these convictions. We trust that, as an officer of the court, the prosecutor would not have offered to produce further certified priors already obtained if they were not in fact on file. Further, the court's reliance on "criminal history" roughly equates to consideration of the numerosity of defendant's prior convictions under California Rules of Court, rule 4.421(b)(2) (listing as an aggravating factor that "[t]he defendant's prior convictions as an adult … are numerous"). Therefore, certified records of fewer than all 10 prior convictions would suffice. (See *People v. Black*, *supra*, 41 Cal.4th at p. 818 [five prior convictions including misdemeanors were "numerous"]; *People v. Searle* (1989) 213 Cal.App.3d 1091, 1098 [three prior driving while intoxicated convictions were numerous].)

Because steps (1)(a) and (1)(b) are satisfied, we hold the sentencing error harmless. (See *Dunn*, *supra*, 81 Cal.App.5th at p. 410, review granted.) We would reach the same conclusion even if we were to apply *Lopez*'s framework instead of *Dunn*'s. Applying the *Chapman* standard of review to both aggravating circumstances cited, as required in *Lopez* step (1), we would also conclude that *beyond a reasonable doubt* the fact finder would have found true beyond a reasonable doubt both of the aggravating

circumstances. (See *Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11.) Thus, even applying *Lopez*, our analysis would end without reaching step (2). (See *ibid.* ["If the answer to [the first] question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term"].) Accordingly, we do not reach the second step of the analysis, where defendant begins and ends his argument.

## DISPOSITION

The judgment is affirmed.

                                                                    PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.

31.